2023 UT App 122

## THE UTAH COURT OF APPEALS

STATE OF UTAH, IN THE INTEREST OF H.M. AND D.M.,
PERSONS UNDER EIGHTEEN YEARS OF AGE.

G.B.,
Appellant,
*v.*
STATE OF UTAH,
Appellee.

Opinion
No. 20220774-CA
Filed October 13, 2023

First District Juvenile Court, Logan Department
The Honorable Kirk M. Morgan
No. 1187751

Julie J. Nelson and Alexandra Mareschal,
Attorneys for Appellant

Sean D. Reyes, Carol L.C. Verdoia, and John M.
Peterson, Attorneys for Appellee State of Utah

Jonathan P. Thomas, Attorney for Father

Martha Pierce, Guardian ad Litem

JUDGE RYAN D. TENNEY authored this Opinion, in which
JUDGES GREGORY K. ORME and DAVID N. MORTENSEN concurred.

TENNEY, Judge:

¶1    Mother and Father separated in 2015 and were divorced in 2018. They had two children during their marriage—D.M. and H.M. (collectively, the Children). From 2015 until 2020, Mother repeatedly told state authorities that Father had physically and sexually abused the Children. In several instances, Mother prompted the Children to make allegations against Father too.

Although authorities investigated the reports, none of the investigations resulted in a finding that Father had abused the Children. Also, on two occasions in 2020, Mother absconded with the Children during times in which she did not have custody. Both times, law enforcement was involved in locating and returning the Children to Father's custody.

¶2     After Mother encouraged one of the Children to file a new report of abuse against Father in January 2022, the Division of Child and Family Services (DCFS) filed a petition to terminate Mother's parental rights. At the close of a several-day trial, the juvenile court issued an order finding that Mother "cannot stop her destructive behavior" of making "false allegations" against Father. The court then terminated Mother's parental rights.

¶3     Mother now appeals the termination decision. For the reasons set forth below, we affirm.

BACKGROUND

¶4     Mother and Father had two children during their marriage: D.M., who was born in 2012, and H.M., who was born in late 2014. Mother and Father separated in 2015 when H.M. was approximately three months old, and their divorce was finalized in 2018. Mother subsequently married another man (Stepfather).

*Allegations of Abuse from 2015 Through 2020*[1]

¶5     The reports of abuse began in February 2015, when DCFS received a referral alleging that during the marriage between

---

1. It's appropriate at the outset to explain some of the word choices and information gaps in our recitation of the history of this case. As indicated in the introductory paragraphs of this opinion, this case centers on a years-long history of reports of

(continued…)

Mother and Father, Father would "throw things, but not at [Mother], and punch holes in the doors." DCFS chose not to accept this referral as a basis for action. In June 2015, DCFS received a referral alleging that Father views pornography "including teenaged girls." This referral was unaccepted because there were no allegations that the Children were being abused or neglected.

¶6    In May 2016, DCFS received a referral alleging that after D.M. came back from parent-time with Father, he would not sit down because "his bottom hurt" and his anus was "red and inflamed." The referral was not accepted because D.M. did not make any disclosure that any abuse had occurred. In September 2016, DCFS received a referral alleging that the Children had returned from parent-time with Father with black eyes and that

---

abuse that were made against Father. The reports themselves are not in the record, so the record is limited to descriptions of those reports that came from others (most commonly the juvenile court in its various rulings).

In many instances, the passive voice was used when describing who had made an individual report—i.e., the record would say something like, "a referral was made." To be faithful to the record, we've proceeded similarly. Also, the record sometimes says that a report was made but doesn't then say what DCFS or law enforcement did with that report. And in some instances, the record makes passing reference to a reason a report was unaccepted without then providing much (or even any) explanatory detail. Our silence reflects those omissions too.

While acknowledging these caveats upfront, we note that the clear implications of the record generally and of the juvenile court's termination decision more particularly are that (1) with the exception of the reports that were made by the Children themselves, it was Mother who was making most (if not all) of the reports of abuse against Father and (2) none of the reports of physical or sexual abuse that were made against Father were corroborated or accepted by DCFS or law enforcement.

Father commonly yelled at the Children, which allegedly made D.M. fearful to get out of bed to use the bathroom at night. The referral was unaccepted because the Children did not report any injuries from Father or provide specific details about what Father was saying to the Children.

¶7 In early October 2016, DCFS received a referral alleging that the Children were being physically abused by Father and that H.M. had been sexually abused by Father. The referral was accompanied by photographs of a bruise on H.M.'s leg. When a DCFS worker interviewed D.M. about these allegations, D.M. reported that Father had pushed him into a "monkey bag," but D.M. couldn't explain what a "monkey bag" was. D.M. made no disclosures of sexual abuse.

¶8 In late October 2016, Mother contacted law enforcement and reported that H.M. had complained of his "bum hurting" after returning from parent-time with Father. Mother also said that she changed H.M.'s diaper and that there was blood present and that she had also observed tearing on his anus. Mother told law enforcement that H.M. had said that Father put his finger "in there." DCFS interviewed H.M. the following day. During that interview, H.M. said that he had been "hurt" at "daddy's house," but he made no other disclosures. Shortly thereafter, H.M. underwent a physical examination at the Children's Justice Center (the CJC), but no evidence of sexual or physical abuse was discovered during this examination.

¶9 In September 2017, DCFS received a referral alleging that D.M. had been physically abused by his paternal grandfather. When DCFS interviewed D.M., D.M. said that "grandpa pushed him backwards and he fell on the rocks, because he didn't hear grandpa." When the grandfather was then interviewed, he acknowledged that he had accidentally knocked D.M. over during a recent visit when moving him away from something.

¶10    In June 2018, DCFS received a referral alleging that during a parent-time exchange, Mother had pulled Father's beard and kicked him and that Father had ripped out one of Mother's hair extensions. This case was not accepted.

¶11    In November 2018, DCFS received a referral alleging that Father attempted to hit Mother with his car and that Father had threatened to kill Mother by loosening the screws on her car. While investigating this referral, DCFS interviewed both of the Children. H.M. reported that he gets "hurt" at "all of my parents' houses," that his parents get frustrated with each other, and that Father punches Mother. D.M. reported that his parents are "always fighting."

¶12    In December 2018, March 2019, and April 2019, Father made reports against Mother suggesting that she was using illegal drugs and wasn't taking proper care of the Children. None of the referrals were accepted.

¶13    In April 2019, DCFS received a referral alleging that the Children had been "sodomized" by both Father and the paternal grandfather during visits with Father and that the paternal grandmother was aware of the abuse but not intervening. The referral also alleged that Father had punched D.M. in the stomach and testicles. As part of an investigation into these allegations, both of the Children were interviewed at the CJC. Though somewhat unclear, the record suggests that D.M. said nothing about abuse in his interview. H.M., however, said that his "old dad" is "going to be in the car when it explodes" "because he was mean to me." H.M. also said that Father "put his penis in my bum" and "spanks [my] bum." H.M. said that Father did the same thing to his cousins and that Mother told him this. When the interviewer spoke to Mother about what the Children had said, Mother asked the interviewer to talk to D.M. again, which the interviewer declined to do. During this investigation, Mother was "jittery and unable to finish sentences."

¶14 In May 2019, Mother sought a protective order against Father. The protective order request was later denied. Around this same time, Mother informed DCFS that H.M. had bloody stools and that H.M. had reported that Father had "punched and kicked him." Later that month, DCFS received information that H.M. had allegedly said Father "peed in his butt." Father denied all allegations when interviewed by a detective from the Smithfield City Police Department.

¶15 In June 2019, DCFS received another referral alleging that the Children were being physically, sexually, and emotionally abused by Father. DCFS visited with the Children and observed no suspicious bruises. DCFS also found the accusations of physical abuse to be without merit. As part of this investigation, a DCFS caseworker and a Smithfield City Police Department detective interviewed Mother. During this interview, Mother alleged that the Children had told her that they "are being raped" and "punched in the crotch" by Father.

¶16 On July 1, 2019, Mother brought the Children to the CJC for an interview. At the outset of H.M.'s interview, and before the DCFS interviewer had even finished explaining the nature of the interview to him, H.M. said, "Well, my dad puts his penis in my bum." H.M. said that Mother was present when this occurred, and that Father, paternal grandfather, and paternal grandmother "did it." H.M. further reported that Father punches him with a "real hammer that is metal and black." H.M. also reported that Father punches him in the penis and "punches me with his butt." When asked what he saw when Father put his penis in his bottom, H.M. said, "That's all I needed to tell you. I didn't see anything." When asked again what he saw, H.M. responded, "That's all I have to tell you." D.M. was also interviewed at the CJC that day. D.M. responded "nothing" and "I don't know" to the majority of the interviewer's questions. He also said that "nothing happened" at Father's house and that "nothing happened to his brother that hurt him." In addition, D.M. told the interviewer that Mother

would talk to H.M. about events that happened at Father's house. After finishing the interviews with the Children, the interviewer and a Smithfield City Police Department detective interviewed Mother. They encouraged Mother "not to press" the Children "for information and not to question them."

¶17 Later that month, Mother contacted law enforcement during a parent-time exchange with Father. Mother told law enforcement that the Children wanted to share "their concerns" regarding Father. The Children spoke to law enforcement, and nothing further was reported to DCFS.

¶18 On February 21, 2020, DCFS received another referral alleging that the Children were being physically, sexually, and emotionally abused by Father. This referral alleged that Father had threatened to kill the Children and Mother if the Children reported the abuse. The referral further alleged that, within the past few days, Father had touched the Children's genitals and "'go[ne] inside' their bums." The referral also alleged that Father would give D.M. medicine to induce vomiting when D.M. would make a mistake on his homework and that Father would not allow the Children to use the bathroom in the middle of the night.

¶19 While investigating this latest referral, a DCFS investigator met with Father and the Children at Father's home. Father denied each allegation. The DCFS investigator also observed that the Children interacted with her appropriately, appeared happy and healthy, and had no marks or bruises. During this investigation, DCFS came to believe that the Children were being emotionally abused by Mother.

¶20 On February 25, 2020, DCFS received a report that Father takes the Children to "drinking parties," that Father stalks Mother and Stepfather, and that Father "rapes" the Children. The Smithfield City Police Department conducted a welfare check but failed to find any support for the allegations or anything out of

the ordinary with the Children. At this point, the Smithfield City Police Department informed DCFS that it would no longer conduct welfare checks on the Children "because of the number of reports made and lack of findings of concern."

¶21    DCFS interviewed the Children again at the CJC on March 2, 2020. H.M. reported that Father and neighbors put cameras outside his house and that the "cameras are made from poisonous stuff that make[s] people go crazy and rip kids' heads off." H.M. said that the cameras have speakers to "do bad stuff to [Mother]." H.M. denied having ever been hurt and denied that anyone told him what to say at the interview. In his interview, D.M. reported that he didn't "remember if anything has happened to him" and that there was "nothing he needs to talk about" happening at either parent's house. D.M. also stated that no one told him what to say at the interview.

¶22    On March 20, 2020, Mother obtained an ex parte protective order against Father. A few days later, DCFS received a report alleging that Father had been sexually inappropriate in front of the Children, that Father had raped Mother in the presence of the Children, and that Father had been telling the Children that there are cameras at Mother's house watching them. Father denied these allegations.

¶23    On March 26, 2020, the court held a hearing on the ex parte protective order. Less than an hour before it began, Mother texted a DCFS employee and alleged that the Children wanted to tell her about abuse from Father. Mother then brought a recording of the Children alleging sexual abuse by Father to the court hearing, so the hearing was continued. At a hearing that was held on April 30, the court ordered that despite Mother's allegations, Father could resume his previously ordered parent-time.

¶24    A few days later, Mother refused to bring the Children to the exchange point, telling law enforcement that she believed the

Children were in danger. That same day, the Children were interviewed at a DCFS office. Without prompting, and without waiting for the interviewer to explain what the interview would be about, H.M. said that Father had "choked him, peed in his mouth, and put his penis in his bum and it bled, and that [H.M.'s] neck was broken." H.M. said that these things all occurred in the middle of church and that "they" were wearing church clothes when it all happened. When asked for more detail, H.M. said, "that's all I said, that's all I needed to tell you about," and he continued to reply "that's all" and "that's all he did" to further questions. H.M. then became emotional and visibly upset, and when asked why, H.M. responded, "[B]ecause that's what I needed to say to you!" When asked if someone had told him what to say, H.M. said that he and Mother had "talked on the iPad about it."

¶25 When Mother was asked about H.M.'s statements later that day, Mother claimed that H.M. must have been referring to the recorded disclosure he had previously made and which Mother had previously brought to court. Following the interview, Mother asked DCFS if she still needed to send the Children to Father for parent-time the following day. DCFS informed Mother that there was not enough information to support the allegations and that it was not recommending any adjustment to parent-time.

¶26 On May 3, 2020, law enforcement was called to conduct a welfare check at Mother's home after she reported that she was afraid Father was going to come shoot her and the Children. A week later, DCFS received a report that Father had been unable to retrieve the Children for his parent-time. Law enforcement soon learned from the maternal grandfather that Mother and the Children were staying at a local hotel, but he would not disclose its location. On May 9, 2020, Mother brought the Children to the Bountiful City Police Department to demonstrate to law enforcement that the Children were physically safe.

¶27 On May 11, 2020, Mother called law enforcement in Tooele to report that the Children's paternal aunt and uncle were sexually and physically abusing the Children. The next day, DCFS received an additional report that Mother had told law enforcement in Layton that the Children had been sexually abused by Father and were being victimized by a sex trafficking ring. Law enforcement stated that Mother was speaking rapidly and that the conversation "went in circles." Law enforcement was concerned that Mother was under the influence of a substance or was suffering from a mental illness. H.M. also called law enforcement that day and reported that he had been abused.

¶28 On May 14, 2020, Father obtained a writ of assistance, authorizing the help of law enforcement to retrieve the Children from Mother. Mother refused to cooperate with this order, so Father received a second writ of assistance on May 21, 2020, authorizing law enforcement to locate Mother through cell phone tracking. The Children were eventually recovered from a hotel by law enforcement.

*Protective Supervision Services Case*

¶29 On May 26, 2020, the State filed an expedited verified petition for protective supervision with the juvenile court. The State requested that the Children remain in Father's custody, with DCFS providing protective supervision services. In June 2020, the juvenile court ordered DCFS to supervise the Children's visits with Mother moving forward.

¶30 During a supervised visit at a DCFS office on July 2, 2020, Mother, Stepfather, and a step-grandfather took the Children and left the building. H.M. cried, yelled, and became upset when the step-grandfather picked him up and carried him out. Mother and the others left with the Children despite DCFS employees telling Mother that law enforcement would be called. Law enforcement soon located Mother, Stepfather, the step-grandfather, and the

Children in a nearby canyon and, pursuant to a warrant, returned the Children to Father.

¶31 On July 13, 2020, the juvenile court found that Mother had neglected the Children by attempting to alienate them from Father and by making repeated reports that Father had abused the Children. The court ordered the Children to remain in Father's custody, and it further ordered that Mother's visits must be supervised by a professional visit supervisor and a security guard. The court also ordered Mother and Stepfather to participate in psychological evaluations and receive treatment. Mother and Stepfather subsequently participated in the ordered psychological evaluations and participated in follow-up treatment with a psychologist specializing in high-conflict custody cases. The evaluating psychologist concluded that Mother "is stuck in her narrative about what has transpired with the Children" and that she "lacks insight into her own behaviors."

¶32 The Children began receiving therapy from a trauma therapist (Therapist). Therapist initially diagnosed both of the Children with an acute stress disorder, though she later modified the diagnoses to post-traumatic stress disorder. Therapist opined that the Children had suffered cumulative and complex trauma because of Mother's actions, and Therapist noted that their symptoms included intrusive thoughts, negative moods, sleep disturbances, irritable behavior, angry outbursts, and physical aggression. In an August 2020 letter to the court, Therapist said that both Children, and more particularly H.M., had expressed fear of being "stole[n]" by Mother again and of having the police "chase [them] down." Therapist also described D.M.'s stress related to the May 2020 hotel stay.

¶33 As noted, Mother began having supervised visits with Children in July 2020. DCFS's progress notes indicate that Mother asked "some inappropriate questions during the visits," e.g., that she had asked the Children "multiple times if they are ok or if

there is anything wrong" and that Mother also questioned the Children about "where they live, who lives with them, and if anyone is telling them not to tell her things." Although Mother had been told several times not to talk to the Children about the case, Mother asked the Children in September 2020 "if they could tell someone about the things they told her and the things she said were not crazy," and that if they did, "they could go home with her because 'they think that I'm lying.'" When the supervising DCFS caseworker (Lead Caseworker) told Mother not to talk about these things with the Children, Mother became defensive and told Lead Caseworker to "back off."

¶34 Mother's supervised visits began proceeding without serious incident, though, and in March 2021, the juvenile court removed the requirement that a security guard be present. The court also ruled that the Children could have visits in Mother's home if Mother provided a minimum of three negative drug tests and was in compliance with all other provisions from a Child and Family Plan. In April 2021, Therapist noted that D.M. had said that he had "mixed up feelings" about the possibility of staying at Mother's home. D.M. said that he wanted to "stay overnight at [his] mom's house," but he was "scared" that she would "ask questions about [him] getting hurt" and felt like he had "to answer those things she asks." Therapist also noted that D.M. felt pressured by Mother to say that "bad things" had happened at Father's house. Therapist noted that D.M. feels like he "disappoint[ed]" Mother if he told her that he was safe at Father's house.

¶35 In May 2021 and again in July 2021, the juvenile court increased the length of Mother's visits with the Children. In September 2021, the court began allowing unsupervised visits at Mother's home. In October 2021, however, the Children told DCFS that Mother "was starting to ask questions" about Father's "house like before and they [didn't] like it when" she did that. In November 2021, the Children reported to DCFS that "the visits

have been going well" and that Mother "hasn't asked them questions about [Father's] house anymore."

¶36    At a December 8, 2021, review hearing, the Guardian Ad Litem (the GAL) recommended closing the protective supervision services case due to the substantial completion of services provided to Mother and Stepfather. At the close of the hearing, Father was awarded primary custody of the Children, and the juvenile court ordered the Children to be released from the protective supervision of DCFS. The case was then closed.

*Mother's Allegations Against Father Resume*

¶37    Less than a month after the protective supervision case was closed, a series of events occurred in rapid succession that again involved Mother implicating Father in alleged abuse.

¶38    On January 3, 2022, D.M. reported to a school counselor that Father was hitting him. D.M. was unable to provide any further context or detail about the alleged abuse. On January 4, DCFS received a referral that Mother was acting erratically and had perhaps used methamphetamine. That same day, Mother refused to return the Children to Father following a mid-week visit. On January 5, DCFS received a referral alleging that Father "may have" physically abused D.M. On January 6, Mother attempted to take the Children from their school, even though that day was not hers under the parent-time schedule. Law enforcement was called, and in the presence of both the Children and other school children, Mother accused Father of attempting to kidnap the Children. The Children went home with Father.

¶39    On January 10, D.M. was interviewed at the CJC. During the interview, DCFS received an additional report that Father was physically abusing D.M. and sexually abusing him by putting "his private parts in [D.M.'s] private parts." When the interviewer asked D.M. about this information, D.M. stated that Father "hits

[him], spanks [him], chokes [him], and hurts [him]," but he denied that Father had done anything else to his body. When D.M. was asked why he decided to talk about these things that day, D.M. stated he "wanted to get it out" and was "too scared to talk about it before." H.M. was also interviewed at the CJC that day, but he said nothing about any abuse.

¶40 That same day, DCFS learned that the Cache County Sheriff's Office had just received a letter that was written by D.M. in which D.M. alleged that Father had physically and sexually abused D.M. and H.M. When a detective spoke with Mother that day, Mother told him that she had "no idea" that D.M. had written the letter. On January 11, D.M. was interviewed at his school regarding the letter by a detective (Detective). D.M. said that "nobody knows about the letter" and that he had ridden his bike to drop it off in a mailbox. When asked for further details, D.M. responded, "I don't know" and "I don't remember." D.M. also said that he "knew" the address for the sheriff's office and that he had run a Google search and used YouTube on his tablet to learn how to send a letter.

¶41 Detective obtained a search warrant allowing him to examine the tablets used in Mother and Stepfather's home. Pursuant to this search, Detective found no evidence of any searches like those described by D.M. But Detective did learn that Mother had searched "when does Sheriff read the mail" on January 10, 2022.

¶42 After obtaining this evidence, Detective interviewed Mother again at the sheriff's office. Mother now acknowledged that she had taught D.M. how to "write this letter." She also admitted to having looked up the address of the sheriff's office and having taken D.M. to the post office to mail the letter. Mother then said that D.M. had told her that Father has "hit, choked, and sodomized" him and that H.M. had said that the first time Father "sodomized him" was when he was three years old. Mother said

that H.M. couldn't sit down because it hurt and that "something came out of his butt when he went to the bathroom." Mother said she was having his underwear "tested for DNA" "in Florida," but she refused to give Detective any more information about the alleged DNA testing. Mother said that she "knows this stuff is true" and that the Children were being "put back with" a "pedophile."

¶43 On January 12, D.M. was again interviewed at school, this time by Lead Caseworker. D.M. began crying and stated that Mother "made me write that letter." D.M. said that the "choking, the spanking and the hitting" "didn't really happen" and that Mother had instructed him to write a letter about "something bad about" Father and "all the mean stuff she thinks has happened" to D.M. He said that he did not ride his bike to the post office but that Mother had helped him address the envelope and had then driven him there. Lead Caseworker also interviewed H.M. at school that day. H.M. reported that Mother "forced" D.M. to write a letter to the police because Mother "is trying to get dad arrested" "so they can live with her forever." At trial, Therapist testified that both Children told her the same things about the events surrounding this letter and that both Children had also told her that as they were mailing the letter, Mother exclaimed, "This is a day we will celebrate every year."

*Termination Proceedings*

¶44 DCFS sought protective supervision services for the Children on January 19, 2022. In February 2022, DCFS filed a petition for the termination of Mother's parental rights.

¶45 The Children soon resumed regular therapy with Therapist. Therapist later testified that "D.M. came in very tearful, very confused. He had been through four to five interviews" in one week and was "wrestling with himself because he had lied during some of them because he felt like that was the right thing

to do for" Mother. Therapist testified that D.M. was "having a lot of shame towards himself" and that D.M. told her that he felt like he had "to say that these things have happened in order to make [Mother] happy." Therapist said that H.M. told her that he was "tired of all the asking stuff with [Mother]."

¶46 From January 2022 through the termination trial in July 2022, Mother was only allowed to have supervised visits with the Children. Therapist later testified that H.M. was initially "very, very vocal about not wanting to do the visits." H.M. told Therapist that Mother "just—she comes at me and comes at me. I don't want to go. I don't want to deal with it." After a March 2022 visit, H.M. reported to Therapist that he "didn't like it and it didn't feel safe." H.M. said that "it sort of made [his] stomach hurt and like maybe she was going to take [him] again."

¶47 Lead Caseworker later affirmed Therapist's view that H.M. was initially hesitant to have visits with Mother after the January 2022 incidents. She subsequently testified that H.M. refused to attend one visit with Mother and that when he had visits with Mother early on, he was "emotionally dysregulated." But Lead Caseworker also testified that H.M. eventually warmed up to the visits and that by the time of trial, he would sit in Mother's lap and hug her. Lead Caseworker testified that D.M. was "very good" with Mother and that they "like to play together."

¶48 The GAL was still concerned, though, and requested that Mother's supervised visits be suspended. The court held a hearing in May 2022 to consider this request. At the close of the hearing, the juvenile court found that there was "no evidence whatsoever of any harm or trauma being caused to D.M. from the visits with [Mother] that have occurred subsequent" to January 2022 and that "[s]upervised visitation is in the best interest of the Children." The court emphasized that it intended "for the visits between the Children and [Mother] to occur, regardless of whether the Children want to go or not." Shortly before trial, D.M. indicated

that he wanted visits with Mother to "last longer," and H.M. indicated that he wanted the visits to be at Mother's house.

*Trial*

¶49 In July 2022, the juvenile court held a four-day trial on DCFS's petition to terminate Mother's parental rights. The court heard testimony from 17 witnesses, including numerous professionals.

¶50 The State called Mother as a witness on the first day of trial. During her testimony, Mother claimed that she hadn't personally seen the letter that D.M. wrote to the sheriff in January 2022 and that she was now seeing it in court for "the first time"; Mother also claimed that she didn't know what its contents were. But the State introduced evidence showing that Mother's assertions about the letter were not true. For example, the State introduced a video of Mother's interview at the sheriff's office, and this video showed Mother reading the letter. The State also introduced an email that Mother had written to her father (the Children's maternal grandfather) after the incident that showed that she was aware of the letter's contents.

¶51 As for the long-term allegations of abuse that had been made against Father, Mother testified twice that she didn't know if Father had actually abused the Children. And with respect to the allegations she'd made against Father, Mother testified that she had "followed the rules" and that she had "made sure" she didn't talk to the Children about their disclosures to authorities.

¶52 Lead Caseworker testified at trial. She testified that the Children had been traumatized by "the fear of them being taken," noting that H.M. has "dreams about a commander coming into a hotel room," which Lead Caseworker linked to the incident in 2020 in which law enforcement retrieved the Children from the hotel. Lead Caseworker also testified that DCFS sought

termination of parental rights instead of another round of protective supervised services because DCFS had "exhausted all options." She said that while Mother "in her own testimony has said that she learned a lot [from the protective supervision services case] and that she . . . knew at the time what to do in that situation," Lead Caseworker didn't "know what more we could provide."

¶53 Therapist testified at trial too. According to Therapist, when she began seeing the Children in January 2022, the Children "expressed a fear" about "what possibly may happen again," wondered if Mother "would take [them] again," and asked whether they would "have to go to the hotel again." When Therapist was asked whether she thought there was "anything less significant than the complete termination of [Mother's] rights that can adequately protect these Children," she responded, "if we look at adequate protection coupled with normalcy, the answer to that is no." Therapist further testified that her recommendation for terminating Mother's parental rights "was based on the cumulative therapy [she] had done with the [Children] in the last few years" and that she thought that termination was in "their emotional best interest." Therapist testified that H.M.'s "exact words" to her were, "How would you feel if this were always happening to you? I just want a normal life." When she was asked how Mother could be stopped from continuing to traumatize the Children, Therapist testified, "We stop the interaction." She also testified that although DCFS "may have talked about the possibility of supervised visitation," "that's not really along the normal, natural developmental means, and so I didn't feel like that was the best option."

¶54 In the GAL's closing argument, she emphasized that "[c]ontact that isn't highly structured and supervised, holding [Mother] accountable, results in trauma to these Children. They've expressed discomfort about the idea of being in [Mother's] presence without a protective third party present." The

GAL further asserted that Mother "cannot be trusted to follow a court order. She cannot be trusted to act in the best interest of her children. Supervising visits for the rest of these Children's childhood is not feasible, it's not in their best interest, it's not appropriate. Nothing less than termination of this relationship can adequately protect these Children now and into the long term."

¶55    After the GAL's closing argument concluded, Mother's counsel asserted in her own closing argument that "[t]o presume that—first of all, that there's no other choice but termination in this case, I don't think it's a reasonable position." Mother's counsel argued that

> there were no specific reasons given during trial as to why these other options were not possible. Some of these less—you know, short of termination options would be to reopen the [protective supervision services] case and to implement . . . a reliable source for the kids to contact directly as to eliminate . . . the possibility of them making reports to either parent, to implementing a high-conflict therapist/family counselor . . . . Or start a new [protective supervision services] case . . . . Or permanent legal custody and guardianship with the dad, but which would allow the mom to remain in the kids' lives and continue playing an active role in that. There are other options that would—that are short of termination that would preserve—that would enable the kids to continue having a relationship with their mother.

Mother's counsel asserted that Mother had "worked hard and earnestly" to "be a better mom" and "did everything she was asked to do." Mother's counsel admitted that after the close of the protected supervision services case, "not all of the

recommendations made by the therapist were followed," but counsel suggested that if there had been "an assigned family therapist in place . . . we wouldn't be here today." Counsel concluded her argument by requesting that the court reopen the prior protective supervised services case and "require the parties to comply with the recommendations as given by the service providers."

*Termination Decision*

¶56 The juvenile court subsequently issued a written decision terminating Mother's parental rights to the Children.

¶57 Early in this ruling, the court found the testimony of Therapist to be "both credible and helpful in provid[ing] understanding of the harm done to the Children due to the actions of [Mother]." By contrast, the court found that Mother's testimony at trial "was not credible and at times was simply untruthful." Specifically, the court contrasted Mother's testimony that she had never seen D.M.'s January 2022 letter and that she was unaware of its contents with the video showing her reading the letter at the sheriff's office. The court also found that Mother had given "different versions of her story of how [D.M.] wrote the letter and how the letter was then mailed to the sheriff's office."

¶58 Addressing the January 2022 letter, the court found that D.M. "first lied to the sheriff deputy and stated that he wrote the letter without the help of his mother and rode himself to the post office to mail the letter," and the court opined that it "cannot find any other reason for [D.M.] to lie about how the letter was written and delivered to the post office other than [Mother] telling him to do so." The court found that "the allegations stated in the letter were false and were contrived by [Mother] to cause harm to and further alienate [Father] with his Children."

¶59 The court then found that six grounds for termination had been established: abuse, neglect, unfitness, failure to provide care,

token efforts, and "other." As part of its unfitness analysis, the court found that "[a]fter years of unsubstantiated allegations of abuse against Father," Mother "still fails to show any real remorse for her actions and their consequences on the Children. She simply testified that she 'doesn't know' whether or not the Children have been or are being abused by" Father. The court found that "[a]fter years of therapy and services by DCFS, [Mother] refuses to take any responsibility for her behavior." The court concluded that Mother "has shown that she cannot stop her destructive behavior regarding false allegations and refuses to take any responsibility regarding the Children's statements to DCFS and law enforcement."

¶60   The court then determined it was in the Children's best interest to terminate Mother's rights and that it was also strictly necessary to do so. In its best interest determination, the court found that Mother "is unable to accept any court order that does not grant her primary care and custody of the children and will distort facts and perceptions until it makes sense to her that she should have custody." The court found that Mother

> has not demonstrated the ability to sustain progress in treatment that shows that the Children would be safe in her care. Her actions taken less than a month after the protective supervision services case closed demonstrates that she has not responded to the extensive services provided to her. [Mother] has shown that when she is not subject to the strict oversight of DCFS and this Court, she reverts to allegations of abuse against [Father].

¶61   Under a separate subheading devoted to the strictly necessary determination, the court found it had "considered less-restrictive alternatives than termination of [Mother's] parental rights" and that a "permanent custody and guardianship

arrangement is unworkable and not in the best interest of the Children." The court found that Mother "has made or caused to be made a multitude of false allegations of physical and sexual abuse against [Father] throughout a period [of] seven years, causing the Children to be interviewed repeatedly and examined and having their lives investigated." The court further found that "[a]ny contact" that Mother has with the Children "is likely to result in an additional false allegation, necessitating additional investigation, interviews, etc., all to the serious detriment of the Children." Finally, the court found that even when it "ordered [Mother] to be restricted to supervised visits by DCFS with the children, [Mother] absconded with the children. The Court cannot perceive a less-restrictive alternative which would protect the Children from further trauma without terminating [Mother's] parental rights."

## ISSUES AND STANDARDS OF REVIEW

¶62 Mother challenges the termination order on two primary grounds. First, she argues that in its best interest analysis, the juvenile court "failed to consider all the facts" and improperly relied on past events rather than engaging in a present-tense inquiry. Second, she argues that the court "did not make findings as to why supervised visitation was not feasible."

¶63 This court applies "differing standards of review to findings of fact, conclusions of law, and determinations of mixed questions of law and fact." *In re E.R.*, 2021 UT 36, ¶ 14, 496 P.3d 58. "A best interest determination involves neither a pure finding of fact nor an abstract conclusion of law. This is a mixed determination of law and fact—in which the abstract law is applied to a given set of facts." *Id.* ¶ 17. "The juvenile court's decision can be overturned only if it either failed to consider all of the facts or considered all of the facts and its decision was

nonetheless against the clear weight of the evidence." *Id.* ¶ 31 (quotation simplified).[2]

ANALYSIS

¶64 The Utah legislature has determined that "[a] child's need for a normal family life in a permanent home, and for positive, nurturing family relationships is usually best met by the child's natural parents." Utah Code § 80-4-104(8). In light of this, a "juvenile court should only transfer custody of a child from the child's natural parent for compelling reasons and when there is a jurisdictional basis to do so." *Id.* "When the [juvenile] court considers a child's welfare and best interest, the court's focus should be firmly fixed on finding the outcome that best secures the child's well-being." *In re B.T.B.*, 2020 UT 60, ¶ 64, 472 P.3d 827.

¶65 To terminate a parent's rights, a court must find that (1) a statutory ground for termination exists and (2) termination is in the child's best interest. *See id.* ¶¶ 19–20. With one minor exception that we address below in Part III, Mother's appeal does not challenge the court's determination that there were grounds to terminate her parental rights. Rather, Mother's appeal is focused on the best interest portion of the court's ruling.

¶66 "The best-interest inquiry is wide-ranging and asks a court to weigh the entirety of the circumstances of a child's situation, including the physical, intellectual, social, moral, and educational training and general welfare and happiness of the child." *In re J.J.W.*, 2022 UT App 116, ¶ 26, 520 P.3d 38 (quotation simplified). By statute, a court can only find that termination is in the best

---

2. Mother also advances a few additional arguments relating to the grounds for termination and the broader scope of the allegations against her. These arguments are subject to this same standard of review, and we address them together in Part III.

interest of a child if it also finds that "termination of parental rights, from the child's point of view, is strictly necessary." Utah Code § 80-4-301(1); *accord In re B.T.B.*, 2020 UT 60, ¶ 66. The "statutory language uses the verb 'is,' indicating that the best-interest inquiry is to be undertaken in a present-tense fashion." *In re Z.C.W.*, 2021 UT App 98, ¶ 13, 500 P.3d 94. Moreover, Utah law presumes that "[i]t is in the best interest and welfare of a child to be raised under the care and supervision of the child's natural parents." Utah Code § 80-4-104(8). In light of this, a juvenile court "must determine whether a feasible option short of imposing the ultimate remedy of terminating the parent's rights exists, and if it does, the court must choose it." *In re K.Y.*, 2022 UT App 149, ¶ 34, 523 P.3d 1159 (quotation simplified).

¶67   As noted, Mother advances two main challenges to the court's ruling. First, Mother argues that the court did not properly account for the present-tense best interest of the Children, but that it instead improperly relied "on outdated information." And second, Mother argues that the court erred by not determining on the record whether an order of ongoing supervised visitation was a feasible non-termination option. We reject both challenges.

## I. Present-Tense Best Interest of the Children

¶68   Mother argues that the court's conclusion that it was in the best interest of the Children to terminate her parental rights was "based on outdated information." In Mother's view, the court failed to properly account for the fact "that between January 2022 and July 2022, Mother had supervised visits without incident." We disagree.

¶69   Again, it's settled that "the best-interest inquiry is to be undertaken in a present-tense fashion." *In re Z.C.W.*, 2021 UT App 98, ¶ 13. "Because children inhabit dynamic environments in which their needs and circumstances are

constantly evolving," the best interest inquiry must "be undertaken in a present-tense fashion, as of the date of the trial or hearing held to decide the question." *In re A.H.*, 2022 UT App 114, ¶ 34, 518 P.3d 993 (quotation simplified), *cert. granted*, 525 P.3d 1279 (Utah 2023). "In a best-interest inquiry, the relevant question is almost always this one: what outcome is in the child's best interest *now*?" *In re Z.C.W.*, 2021 UT App 98, ¶ 12 (emphasis in original).

¶70 The juvenile court's order in this case was properly couched in present-tense terms. In its findings on unfitness, for example, the court found that Mother "*still fails* to show any real remorse for her actions and their consequences on the children." (Emphasis added.) The court also found that Mother "has shown that she *cannot stop* her destructive behavior regarding false allegations and *refuses* to take any responsibility regarding the children's statements to DCFS and law enforcement." (Emphases added.) Then, in a subsection that was specifically directed at the best interest determination, the court found that Mother's "intent and the effect of her actions *is* to disrupt any semblance of stability the children might enjoy regarding [Father] while in his care," and it further found that Mother "*is* unable to accept any court order that does not grant her primary care and custody of the children and will distort facts and perceptions until it makes sense to her that she should have custody." (Emphases added.) And in another subsection that was specifically devoted to the strictly necessary determination, the court found that "any contact [Mother] has with the children *is* likely to result in an additional false allegation, necessitating additional investigation, interviews, etc., all to the serious detriment of the children," that "Mother has not shown that she *can* stop the false allegations" against Father, and that Mother "*fails* to even acknowledge that the allegations are false or that she is in any way responsible for them." (Emphases added.) In these and other instances in the ruling, the court made it clear that it was making a determination about the present-tense best interest of the Children.

¶71    Given this, Mother's argument is ultimately focused on the alleged lack of evidentiary support for that conclusion. Mother asserts that although the court's ruling may have been written in the present tense, the information that it relied on was so old or stale that the court had no valid basis for concluding that termination was in the Children's present-tense best interest. We disagree.

¶72    In virtually any decision that's made in law or life, questions about the present must in some measure be answered through consideration of relevant events from the past. As famously put by Faulkner, the "past is never dead. It's not even past." William Faulkner, *Requiem for a Nun* 92 (1951).

¶73    Our cases have recognized as much in this very particular legal context. Although it's true that the best interest determination is made in the present-tense, it's also true that "considering what a child's best interest is at the time of trial does not require ignoring historical patterns." *In re A.K.*, 2022 UT App 148, ¶ 8 n.3, 523 P.3d 1156 (quotation simplified), *cert. denied*, 527 P.3d 1106 (Utah 2023). Rather, "a juvenile court judge conducting a best interests analysis must weigh evidence forecasting future events in order to predict what course of action will best protect and nurture the child." *In re C.L.*, 2007 UT 51, ¶ 22, 166 P.3d 608 (quotation simplified). Since neither judges nor expert witnesses are soothsayers, the evidence that a court would rely on to "forecast[] future events" would naturally include evidence of things that had happened in the past between the parent and the children. In this sense, a court is tasked with "weigh[ing] a parent's past conduct with her present abilities" in order to make the statutorily required determination. *In re B.R.*, 2007 UT 82, ¶ 13, 171 P.3d 435.

¶74    Mother recognizes this, but she nevertheless argues that there must be some point at which the evidence is too distant to support a determination about a child's present-tense best

interest. In concept, we agree. But in application, we disagree with Mother's suggestion that the evidence in this case was so remote that it could not be relied on.

¶75 Mother first points out that much of the court's ruling was based on events that had occurred years before trial. And she's right—the court did make repeated reference to events that had occurred years earlier. But even so, we think it significant that the court was not focused on an isolated event or two that had occurred in the far distant past. Rather, the court was focused on a *pattern* of events that had unfolded over the course of several years. As recounted at some length above, Mother began making allegations of sexual and physical abuse against Father in 2015, and she kept making such allegations over the course of the next five years. Mother kept doing so despite the apparent lack of any corroborating evidence. And she repeatedly encouraged her young children to make allegations against Father as well, even though this resulted in the Children being subject to repeated interviews and even physical examinations, and she also did so despite the transparently imaginative nature of some of the allegations.[3] Given that the juvenile court's inquiry in this case was in some measure predictive, its focus on a pattern of behavior that had extended over several years would of course have probative value.

¶76 Even so, Mother points out that her behavior had improved enough by the later months of 2021 to prompt the juvenile court to close the protective supervision services case in December 2021. But as the juvenile court stressed in its termination order, within just a few weeks of that case being closed, Mother encouraged D.M. to write a letter to law

---

3. As noted, the allegations included such things as an exploding car, Father allegedly punching a child in the bottom with a hammer, and Father somehow assaulting and even breaking a child's neck in the middle of a church service.

enforcement with yet another allegation of abuse, Mother lied to authorities when questioned about her involvement in that letter, and Mother publicly accused Father of attempting to kidnap the Children during a confrontation at a school (and she did so in front of other children, no less). These events certainly gave the court some basis for reassessing its conclusion from December 2021 that Mother's pattern of troubling behavior had come to an end.

¶77 This leads to Mother's final assertion, which is that the January 2022 events could not support the termination order that was entered in July 2022 because no further incidents occurred during the January-to-July interim. As an initial matter, we have some skepticism about Mother's suggestion that events that occurred five months before trial are indeed so remote that they could not inform the court's present-tense best interest determination. And our skepticism of this argument is particularly warranted here, where the events that occurred in January 2022 are consistent with a prior pattern of events that had stretched out over the course of several years. After all, even during the 2015 through 2020 period, there were several stretches of several months in which Mother didn't make any allegations. Yet each time, the period of dormancy was later interrupted by new allegations of abuse.

¶78 But more importantly, we disagree with Mother's suggestion that nothing of note had occurred in the January-to-July interim. In reviewing the juvenile court's termination decision, two things stand out.

¶79 First, at the time of the July trial, the court now had access to new information (primarily from Therapist) about the harm that Mother's long-term behavior had inflicted on the Children. On January 24, 2022, Therapist wrote that D.M. reported "feeling very confused because [Father] never did that stuff" but that D.M. did not want to disappoint Mother. Therapist said D.M. felt "sort

of unsafe" because of the events surrounding the January 2022 letter and "all the question asking." And Therapist also said that H.M. reported feeling "tired of all the asking stuff" with Mother and that H.M. thought that life felt "sad and mad and scary" as a result. In a June 2022 letter, Therapist then informed the court that after a March 2022 visit with Mother, H.M. told her that he "didn't like it and it didn't feel safe." She said that H.M. told her that "it sort of made [his] stomach hurt and like maybe she was going to take [him] again."

¶80    Therapist's testimony at trial gave the court even more insight into these harms. Therapist testified that D.M. was tearful in his January 2022 session and that he was "wrestling with himself because he had lied during some of [the interviews] because he felt like that was the right thing to do for [Mother]." Therapist testified that D.M. was "having a lot of shame towards himself" and that D.M. had told her he felt like he had "to say that these things have happened in order to make [Mother] happy." Therapist also testified that after the January 2022 incidents, H.M. was "very, very vocal about not wanting to do the visits" with Mother. She testified that H.M. told her that "[m]y mom just—she comes at me and comes at me. I don't want to go. I don't want to deal with it." She further testified that H.M.'s "exact words" to her were, "How would you feel if this were always happening to you? I just want a normal life."

¶81    The court didn't have this information when it closed the case in December 2021, but it did have this information at trial. And this information could properly inform any decision about what was in the best interest of the Children moving forward.

¶82    Second, the court also had new information about Mother's mindset. In its order, the court found that Mother's trial testimony "was not credible and at times was simply untruthful." For example, the court noted that Mother testified twice that she was seeing D.M.'s January 2022 letter for the first time in the

courtroom, even though a video of an earlier interview with law enforcement showed Mother reading that letter then. The court also highlighted Mother's contrasting stories about how D.M. had written the letter. And the court further determined that Mother's "statements that she has no opinion on whether she believes" that Father abused the Children were "not credible[,] taking into account the history of her actions in this matter."

¶83    Based in part on Mother's July 2022 trial testimony, the court found that Mother "still fails to show any real remorse for her actions and their consequences on the Children." And the court found that although Mother "believes it improves her standing to now say that she 'doesn't know' or has no opinion on whether or not the Children have been abused," she "continues to deny responsibility for the continuous harm of false allegations." Mother's testimony and the court's observations of her mindset were, of course, new information. And this new information would have some proper bearing on the court's assessment of whether it was presently in the Children's best interest to terminate Mother's parental rights.

¶84    Pushing back, Mother points to some contrary evidence showing that there had been some improvement in her relationship with the Children. For example, Lead Caseworker testified that while H.M. initially showed some hesitancy at the visits, by the time of trial he would "sit in mom's lap now where he wouldn't do that before. You know, he'll hug her. Things like that." Lead Caseworker also testified that "D.M. is very good with his mom. I mean, it seems like they like to play together. And they just have fun when he's there." And at trial, Lead Caseworker said that she could not remember any time since January 2022 that the Children expressed to her "any concerns or anxiety about contact with their mom." Also, minutes from a March 2022 hearing indicate that Mother had "been appropriate on her visits." And in a DCFS Progress Report written a month before trial, D.M.

"report[ed] that he wants the visits to last longer and [H.M.] asked to have the visits in [Mother's] house."

¶85   But again, a "juvenile court's decision can be overturned only if it either failed to consider all of the facts or considered all of the facts and its decision was nonetheless against the clear weight of the evidence." *In re E.R.*, 2021 UT 36, ¶ 31, 496 P.3d 58 (quotation simplified). Here:

- The events that occurred from 2015 through 2020 gave the court ample reason to find that Mother had a long-term and persistent desire to make allegations of abuse against Father, that she was willing to directly involve the Children in those efforts, and that she was willing to ignore court orders (such as those she ignored when absconding with the Children on two occasions in 2020).

- The events of January 2022 and Mother's non-remorseful testimony at trial gave the court reason to believe that Mother's good behavior in late 2021 had been temporary, rather than permanent, and that Mother still persisted in her beliefs about Father and her willingness to manipulate the Children or court processes to support her views.

- And the new evidence that the court received leading up to trial and then at trial gave it additional information about the harm that was being done to the Children by Mother's behavior.

¶86   In short, the court was tasked with making a present-tense determination, and its decision reflects that it did. In making that determination, the court could properly consider past and present events together. Although the court had concluded in December 2021 that the protective supervision case should be closed, more recent events had given the court reason to reassess its

conclusions about Mother's ongoing danger to the Children. Given the evidence that was before the court at trial, we see no basis for concluding that the court's decision was improperly based on stale evidence. We therefore reject this argument.

## II. Supervised Visitation

¶87 A court may only terminate a parent's rights if it finds that termination is in the child's best interest and that "termination of parental rights, from the child's point of view, is strictly necessary." Utah Code § 80-4-301(1). "The strictly necessary language is designed to ensure that the court pause long enough to thoughtfully consider the range of available options that could promote the child's welfare and best interest." *In re B.T.B.*, 2020 UT 60, ¶ 69. "If the child can be equally protected and benefited by an option other than termination, termination is not strictly necessary" and "the court cannot order the parent's rights terminated." *Id.* ¶ 66. Moreover, when a juvenile court is presented with a readily apparent non-termination option, the court must "state, on the record, its reasons for rejecting feasible alternatives." *In re K.Y.*, 2022 UT App 149, ¶ 43 (quotation simplified). This "leaves no room for implicit rejection." *Id.* (quotation simplified).

¶88 As noted, the court heard both evidence and argument suggesting that supervised visitation was not a viable solution moving forward. Therapist testified that although DCFS "may have talked about the possibility of supervised visitation," "that's not really along the normal, natural developmental means, and so I didn't feel like that was the best option." And in closing argument, the GAL argued that "[s]upervising visits for the rest of these children's childhood is not feasible, it's not in their best interest, it's not appropriate." As also noted, the juvenile court then made a series of findings about why it was strictly necessary to terminate Mother's parental rights. Despite these findings, Mother argues that the juvenile court "erred as a matter of law

when it did not make findings as to why supervised visitation" was not a feasible alternative to termination. We disagree with Mother's claim that the ruling was lacking in this respect.

¶89 The cases in which we've found that a court erred by not addressing a feasible alternative have involved termination orders that were far less clear than the one at issue here. In *In re K.Y.*, for example, the court's best interest analysis was just two paragraphs long. *See* 2022 UT App 149, ¶ 28. After the State asserted on appeal that the juvenile court had at least "implicitly" rejected a potential guardianship within those two paragraphs, *id.* ¶ 42, we rejected that assertion, explaining that it was unclear to us "which conclusion" the court would have even reached about a potential guardianship, *id.* ¶ 44. The order at issue in *In re J.J.W.* had similar infirmities. There, "the court's best-interest analysis consisted of a single paragraph." 2022 UT App 116, ¶ 16. And while we agreed that the court had "by necessity" implicitly rejected guardianship as an option, *id.* ¶ 32, we still reversed because we still saw no explanation for why the court thought that guardianship was not a viable option, *id.* ¶ 35.

¶90 The ruling at issue in this case is decidedly different. The court devoted nearly three pages of analysis to the best interest inquiry alone, and it then devoted an additional page and a half to the strictly necessary determination. In addition, the ruling as a whole spans over 40 pages, and many of the court's findings and conclusions from the other sections were interconnected and had obvious bearing on the best interest and strictly necessary determinations. Thus, unlike the orders at issue in prior cases where we've found this kind of error, the court here issued a detailed order that gave clear insight into its thinking about the relevant questions.

¶91 This leads to the question of whether the court's ruling left any room for ongoing supervised visits as a non-termination option. Here, the subsection on the strictly necessary

determination began with the court's declaration that it "ha[d] considered less-restrictive alternatives than termination of [Mother's] parental rights" and its conclusion that a "permanent custody and guardianship arrangement is unworkable and not in the best interest of the Children." Under the same subheading, the court recounted the incidents in which Mother had previously absconded with the Children. The court specifically highlighted the fact that the second absconding incident had occurred when Mother "abducted the children from a division-supervised visit at the Division's offices in July 2020." The court then stressed that "[e]ven when the Court ordered the mother to be restricted to supervised visits by DCFS with the children, mother absconded with the children." With this as something of a springboard, the very next sentence read, "The Court cannot perceive a less-restrictive alternative which would protect the children from further trauma without terminating mother's parental rights." The court's focus was thus explicit and clear: the court had concluded that the only way to protect the Children from Mother inflicting "further trauma" on them by absconding with them again was to terminate her parental rights.

¶92 Mother nevertheless stresses that she had not absconded with the Children recently, and in light of this, she suggests that it's unclear why, or perhaps even whether, the court was ruling out supervised visits as a viable option moving forward. But in cases such as *In re K.Y.* or *In re J.J.W.*, we were left guessing at the court's ruling or rationale. Here, however, it requires no guesswork to see that the court had indeed rejected ongoing visitation as an option, nor is there any question about why the court had done so. Again, in the subsection of its ruling that addressed the best interest determination, the court found that Mother "is unable to accept any court order that does not grant her primary care and custody of the children and will distort facts and perceptions until it makes sense to her that she should have custody." And in the subsection that more particularly addressed the strictly necessary inquiry, the court found that "Mother has

not shown that she can stop the false allegations against" Father and that "[a]ny contact the mother has with the children is likely to result in an additional false allegation, necessitating additional investigation, interviews, etc., all to the serious detriment to the children."

¶93 This ruling thus foreclosed the possibility of ongoing supervised visits as a viable alternative to termination. Taking the court at its word, the court's express finding that "any contact" carried the risk of causing potential harm to the Children by definition ruled out ongoing supervised visits. And the court's focus on the prior absconding events, coupled with its findings about Mother's current lack of remorse, collectively explained why the court thought that even supervised visits would still present an unacceptable risk—whether it be of Mother absconding with the Children again or of using any visits (even supervised ones) to raise new allegations of abuse against Father. All of this is drawn directly from the court's ruling.

¶94 In short, the juvenile court was sufficiently clear about its finding that termination was in the best interest of the Children and that termination was also strictly necessary, and the rationales given by the court directly foreclosed ongoing supervision as a feasible option. We see no basis for reversing the decision.

### III. Mother's Additional Arguments

¶95 Mother briefly raises three additional issues on appeal. But none of them warrant reversal.

#### A. Adoption

¶96 At the back end of the best interest section of its ruling, the juvenile court found, "It is in the children's best interests to terminate the parental rights of [Mother] so they may be free from abuse and neglect, so they may receive the proper safety,

parenting, bonding, love, affection and stability they need, and so they may be adopted where they are safe, secure and stable." Mother now argues that the court should not have relied on adoption in its best interest analysis because "adoption by a stepparent is wholly unnecessary" since "Father has sole custody."

¶97     Our best interest cases have suggested that a court should not terminate a parent's rights based on the "categorical concern" that adoption provides more stability to children than some other non-termination option. *See, e.g.*, *In re J.A.L.*, 2022 UT 12, ¶ 25, 506 P.3d 606. But we disagree with Mother's suggestion that the ruling here was categorical in nature. The court's ruling was not only extensive, but it was focused on particular findings of the harm inflicted on the Children by Mother. We see no basis for overturning the decision based on the court's stray reference to adoption in a single portion of the ruling.

B.     "Piling On"

¶98     Mother also argues that the court "piled on its grounds rulings by basing all six of its grounds-related findings on the same 'emotional abuse.'" Mother argues that this practice violated "the spirit of the 'grounds' statutes, if not the letter," because "[p]iling on multiple grounds based on the same subset of facts simply renders the additional 'grounds' superfluous."

¶99     But Mother concedes that this practice "do[es] not provide independent grounds for relief on appeal." And while Mother points to some caselaw from the attorney discipline context that might suggest that it's problematic to "pile on" multiple overlapping charges, Mother provides no authority that supports her view that a juvenile court cannot base a termination decision on multiple grounds if the statutorily defined elements of those multiple grounds have some or even substantial overlap. We're aware of no such authority either, and we therefore see no

basis for overturning this ruling as a result of this alleged problem.

## C.     Mandatory Reporting

¶100 Finally, Mother argues that "the court's findings of emotional abuse are not supported by Utah law, where parents have both a right and a responsibility to report perceived abuse to authorities." In Mother's view, the "court's decision sets up a scenario that fails to protect" children from "physical abuse and instead deems them 'emotionally abused' if one parent reports repeated, suspected abuse by the other." Mother thus argues that the "court's decision faults" her "for protecting [the] Children as she thought best."

¶101   But the juvenile court's extensive findings in this case leave no room for the conclusion that Mother's rights have been terminated for anything like a good faith effort to protect the Children. The juvenile court found, with ample support, that Mother has engaged in a years-long campaign of filing unsupported or false reports of abuse against Father, that Mother has co-opted her children into being participants in this campaign (despite the fact that doing so caused them to be subjected to multiple police interviews and even physical examinations), that Mother has defied court orders and absconded with her children on two occasions, and that Mother lied to law enforcement and the court during the course of official interviews and proceedings.

¶102   We thus emphasize that a parent's rights should not be terminated for making a good faith report of suspected abuse. But we likewise emphasize that nothing like that happened here. Rather, under the terms of the court's order, Mother's rights were terminated because of her years-long pattern of abusive behavior toward her children, not because of a good faith attempt to protect them.

CONCLUSION

¶103   The juvenile court did not err in relying on past events to support its present-tense best interest analysis, nor did it fail to account for the possibility of ordering ongoing supervised visits in its strictly necessary determination. Its decision to terminate Mother's parental rights is accordingly affirmed.